MOORE, J.
|,The defendant, Maurice Joyner, appeals his conviction for aggravated incest and 25-year hard labor sentence. For the following reasons, we affirm the conviction and sentence.
FACTS
The eight-year-old female victim, M.J., born on August 3, 2005, is one of three children born of the marriage of Kelly Gobert and Brian Joyner. Kelly and Brian are divorced, and both have since remarried. Kelly has primary physical custody of M.J., who spends every other weekend with Brian. Brian is the adopted son of the defendant. The defendant is the victim’s legal paternal grandfather, age 78.
The first time M.J. spoke to an adult about inappropriate contact involving her grandfather happened on or about September 25, 2013. M.J.’s stepfather, Alex Gobert, testified first regarding the events leading to the discovery:
I told [M.J.] it was time to. go take a bath and get ready for bed. She went into the bathroom and she’s normally a — a pretty noisy kid and water splashing and then I saw, we had a Labrador puppy about a year old, the door is cracked and I’m sitting in the living room and I saw him go into the — the bathroom and the noises stopped. And I — ... I just kind of keyed in and I listened for a second and I didn’t hear anything and so I was suspicious so I just went in there and peeked in there in the mirror and I observed Maddie with her legs across the tub, might have had her hands on her private area encouraging the dog to come towards her. At that time I just said “[M.J.]” to get her attention and she looked up and she saw me and I just told her, I said, “you need to get out of the bathtub and go to your room and get in the bed, Mom’s coming home, y’all are going to have a talk.”
When Kelly Gobert came home, she asked M.J. what was going on and why she was behaving that way with the dog (“Duke”). Kelly testified 12that M.J. paused and was quiet, and then said “Mommy, what Duke was doing to me Papaw does to me.” M.J. explained to her *727 mother that “Papaw”. was the defendant. Kelly testified:
[S]he said he touches me and then she came out with just several incidences of where and when and some incidences where he had touched her.... She said when we go to the deer camp, he’s touched me when we ride on the 4-wheeler and she said another time she remembered in the bunkhouse the sleeping area, I guess, of the deer camp they have there and she was just verbally letting all of this go I wasn’t involved at that point and, you know, asking questions or anything. And she said he also did this when we were celebrating daddy’s birthday, he took me to his house to see their new puppy that they had just gotten and he had done it then....
Kelly testified that M.J. “just said that he touched her with his hands in her private area.” She did not ask for details, but she understood that M.J. was telling her that her grandfather was using his hands to touch her in her private areas. M.J. listed only those three incidences that night.
Kelly and Alex immediately contacted and met with Brian and his wife, LaDonna, to tell them what M.J. told them. The next day, September 26, 2013, the family went to the police. They first met with Shreveport Police Detective Michael Jones. When Jones realized that at least one incident occurred in Bossier City, he referred the family to the Bossier City Police Department.
The family then met with Bossier City Police Detective Angela Bandy. Bandy interviewed several of the family members and set up forensic interviews with M.J. and her siblings.
Kelly testified that prior to M.J.’s revelation, she “for the most part she’s a very normal, active kid.” She noticed some oddities in her behavior | involving the' dog persistently nosing her “kind of in her private area” and which they directed her to push the dog away. She said she noticed that M.J. was fidgety and daydreaming.
Kelly testified that after the night she revealed the incidents, M.J. was really anxious. She missed several days of school. She was talking a lot, crying a lot, and had problems sleeping; she was seeing things and “crying intermittently out of the blue,!’ and checking locks more than once. Both Alex and Kelly testified that they observed M. J. avoiding the defendant at recent sporting events.
M. J. was interviewed at the Gingerbread House by Jennifer Flippo on September 27, 2013. Among other things, M.J. ex-pláined:
Well, so, my grandpa, he kinda been hurting my feelings.... And he’s been, um, like, on my dad’s birthday he’s taken me to-I want, I wanted to go see, um, his dogs. And then, um, I went and then I was going to see his dog and then he took.me into his house and then he like touched me where I didn’t want him to.
[[Image here]]
And, we have this deer camp at my dad’s farm.... And, whenever we, um, get on the four-wheeler, my dad, um, makes me drive [my grandfather] around on the four-wheeler and he, um, he does it when Pm on the four-wheeler.
M.J. explained that the part of her body where the defendant touched her was “not the bottom, it’s the other part,, in front.” When asked to indicate on an anatomical drawing of a female where the defendant touched her, M.J. circled the vagina.
She told the interviewer about the incident on MJ.’s father’s birthday:
*728 14Well, as I told you, I just wanted to go see his dogs and then he, um, he, we were going inside to let them out and then h.e let them out into the back yard and then he just took me, um, in the living room and did it.... [H]e said if I told anybody, um, he was gonna get really mad at me.
She said during this incident, the defendant did" not undo her pants but was touching her through her clothes. She explained'that at the deer camp, the defendant unzipped her pants, pulled her underwear away from her' body, and touched her. She said that sometimes, the defendant’s hand was moving and sometimes it was still, and that this sometimes hurt because “he would just, like [inaudible] it really hard.” M.J. also said that “sometimes he made it go inside and, um, then sometimes he did it outside.”
M.J. told' the interviewer that she thought the incident on her father’s birthday was the first time that the defendant touched her and then did so “pretty much every time” the family went to the deer camp.
M.J. then recalled another incident at her grandfather’s home in Bossier City when she was accidentally locked in the bathroom:
I remember — well, it was at, it was still at his house but ... well, one time after ... our book fair, we rode with him and then we went to Taco Bell and then his house.... And then, um, I kinda gqt locked in the bathroom and I was standing on the stool when he opened the door and he did it.
She said that she remembered the defendant touching her on her skin “just like outside” during this ■ incident. She said that her brother was outside her grandfather’s home at the time this happened.
She then recalled another part of the incident that happened on her father’s birthday: “Well, he just took off his clothes and then just, um, just took ‘em off and just, um, just stood there.” M.J. said that the defendant did Rnot ask her to do anything to his body nor did he do anything to his own body.
Both of M.J.’s siblings were also interviewed. ' M.J.’s sister, R.J., reported:
[0]ne time, we were at his, um, trailer — he lives in a trailer house — and, uh, I was — I don’t know how old I was, but it was like, a few years ago — and, um, I was lying on the couch and I asked him to scratch my back. And so he did and he got kinda too close to my area — in the front, so I just kinda, like, sat up and then just, like, he stopped. And so then ... that’s like the only time he’s ever done anything to me but apparently it’s been going on with my sister a lot.
R.J. also said that at the hunting camp, she found a magazine under her grandfather’s bed with “like, nasty stuff on the cover” that had “boy parts and then a lady on it.”
M.J.’s brother did not report any inappropriate behavior by the defendant.
Brian Joyner, who was familiar with the deer camp, said that he had seen a pornographic magazine — “Playboy, Hustler, something like that” in the defendant’s suitcase at the deer camp. He had also seen various paperback books in the defendant’s footlocker but Brian explained that he did not look at these particular books.
The paperback books became an issue at trial. According to hearsay evidence, the defendant’s son, Forrest Joyner, removed the books from the defendant’s footlocker at the camp. Although Forrest allegedly retrieved the books at his father’s request, he did not destroy or dispose of them as his father directed. Instead, he delivered the books to Det. Angela Bandy. Prior to trial, Forrest died from cancer. It is al *729 leged that the books | (¡contained sexually explicit stories. At least one of the books was entitled “Family Letters” and, according to the prosecutor’s opening statement to the jury, had an incestuous theme. The defense objected:
Prosecutor: Now the State’s evidence is going to show that the, as the investigation continued, Detective Bandy and Detective Jones interviewed Forrest Joyner. Now this is Maurice Joyner’s biological son. . .
Defense: Your Honor, objection.
Prosecutor: No, Your Honor, this is not a reference to anything he said, this is to reference to a source of evidence, so there’s no need for that. .•
Court: All right. Sustained [sic].
Prosecutor: As the investigation continued, they interviewed Forrest Joyner, not gonna say anything about that, but Forrest Joyner gave the police a bag full of books.
Defense: Objection, Your Honor, may we approach?
Prosecutor: We have evidence to prove that. We have Detective ... Bandy’s going to testify to that.
[Sidebar discussion where the Court ultimately allowed the reference.]
Prosecutor: Thank you, your honor. Detective Bandy’s gonna testify that she received a bag of books from Forrest Joyner, the defendant’s biological son. Forrest is now deceased and she got a-a bag of books, pornographic books, that had been stored at his bunk at the deer camp for a long time and these books were called Family Letters.
Defense: Objection, Your Honor.
[[Image here]]
Prosecutor: Your. Honor, the ... books are — the—the title of the book is Family Letters and we’re gonná, that’s what we’re gonna show. It’s about incest, I mean.
Court: I believe we’ve addressed some of that issue previously. I’m going to overrule the objection at this time_
| ^Prosecutor: These books were called Family Letters and are sexually explicit stories involving the depiction of incestual sexual relationships between relatives such as uncle and niece, brother sister, father daughter, grandfather and granddaughter.
Ultimately, the state was unsuccessful in introducing these books into evidence because no witness could testify that the books were those that were actually in the defendant’s foot locker at camp.
Dr. Sheila Farrell, an expert in pediatrics and pediatric sexual abuse, testified that she performed a physical examination of M.J, on October 7, 2013. The examination revealed no injury to MJ.’s genital area, her hymen was intact, and thus was normal. The doctor explained that these examinations are “normal” “in the majority of the cases ... when kids come in with sexual abuse,” likely because either the sexual contact did not leave any evidence or because any injury had healed by the time of the examination. The doctor also said that she would not expect to find scarfing or abrasions in a situation where the child had been touched or rubbed with fingers or hands. The doctor explained that penetration of a child’s vagina by an adult male finger “could or could not cause trauma” and that penetration of a child’s vagina by an adult male penis was “generally” thought to cause trauma “at the time.” The doctor said that the history she obtained during the exam was that “there was. hand to genital contact” and that she had no report of penile penetration.
*730 M.J.’s counselor, Jennifer Monsour, testified that M.J. was initially fearful during their counseling sessions but later was able to open up and explain the things that had happened to her. Ms. Monsour said that M.J. |swas “extremely consistent” in her stories' about what happened and about who did these things to her.
This- consistency was not always apparent when M.J. testified at trial. On direct examination, she testified that everything she said in the Gingerbread House video was true, and she explained the incidents involving the defendant:
Well, on my dad’s birthday, [Maurice] took me to his house.... We went to see his dogs.... Well, when we got to his house I saw his dogs and then he took me to his room and he told me to lay on the bed and then he took his clothes off and put his leg over me.
She said that the defendant did not touch her or do anything to her at that time.
M.J. described other incidents at the deer camp:
Well, at the deer camp we would always go riding the 4-wheelers and one time we were riding and then I went with Maurice and we went back on the fire lane and he — I was driving and then he — he reached over and unzipped my pants and touched my, he rubbed my private part— [H]egotthe — the three fingers and then he just touched my private part.... [H]e would always lick the three fingers that he would do it with,
She also said, ‘Well, he did it at my dad’s birthday, the deer camp and the, um, dad’s birthday.” .
Regarding the book fair incident, M.J. explained:
So [Maurice] picked us up from the book fair then took us to Taco Bell and then when we got there I was — I was going to the bathroom and then I was standing on a stool to unlock the door and then he opened the door and then he touched my private part.... He did it with the three fingers he always did and he ... he rubbed [on the outside of her pants].
When the prosecutor asked M.J. if there was ever a time when the defendant wanted M.J. to touch his private area, M.J. responded “No, sir.”
|9On cross-examination, M.J. admitted that she sometimes lied about little things to get out of trouble and made up stories about things that didn’t really happen. She testified:
Defense: [W]hen your mom came home a little bit later she confronted you about [the dog incident]?
M.J.: Yes, sir.
Defense: And did she ask you at some point why do you keep doing that, I have to have something from you?
M.J.: Yes, sir.
Defense: And did you tell her what [the dog] is doing to me is what Papaw is doing to me?
M.J.: Yes, sir.
Defense: You think maybe you said— you think maybe you said that because you were trying to get out of trouble?
M.J.: Yes, sir.
Defense: I’m sorry?
M.J.: Yes, sir.
Defense: You said that to get out of trouble?
M.J.: Yes, sir.
Defense: Was papaw really doing those things to you?
M.J.: Yes, sir.
M.J. denied that the defendant ever put his face between her legs. During cross-examination, defense counsel asked M.J. about any statements she may have made *731 to Ms. Flippo or Ms. Monsour about contact with the defendant’s penis.
| ^Defense: If you told [Ms. Monsour] that on a couple of time or a couple of occasions that he made you grab his penis and squeeze it would that be the truth or would that be a lie?
M.J.: It would not be the truth.
Defense: If you said that you touched his penis and felt like there were little rocks inside of it, would that be the truth or would that be a lie?
M.J.: That’s the-that would be the truth.
Defense: Okay. So you did touch his penis and felt little rocks inside?
M.J.: Yes, sir.
Defense: If you told Ms. Monsour that he put his penis inside your vagina once or twice, would that be the truth or would that be a lie?
M.J.: Would not be the truth.
Defense: Would not be the truth. If that wasn’t the truth, why did you tell Ms. Monsour that he did that, that he put his penis inside your vagina?
M.J.: Probably because it’s happened so many times, I’ve probably gotten confused.
Defense: It’s happened so many times that he put his penis inside your vagina?
M.J.: No, sir.
Defense: When you say you got confused, are you confusing his hand with his penis?
M.J.: No, sir.
Defense: You do — you do know the difference between a hand and a penis I’m sure, right?
M.J.: Yes, sir.
Defense: A moment ago you said that you didn’t squeeze his penis, but you did touch it and it felt like there Inwere rocks inside?
M.J.: Yes, sir.
Defense: On how many different occasions did you touch his penis?
M.J.: I only touched it once.
Defense: And where was that?
M.J.: At the deer camp.
She further explained that the defendant asked her to touch his penis, that it felt like it had rocks in it the size of a raisin. M.J. also testified:
Defense: You also told Ms. Monsour that in addition to your grandpa touching you on your vagina that he sometimes put a finger inside your vagina, did you tell her that?
M.J.: Yes, sir.
Defense: And you said that sometimes he would put two fingers inside your vagina?
M.J.: Yes, sir.
Defense: And sometimes he put three fingers inside your vagina?
M.J.: Yes, sir.
Defense: When you told her that, was that the truth?
M.J.: Yes, sir.
Defense: And sometimes you said he even put his whole hand inside your vagina, is that the truth?
M.J.: Yes, sir.
M.J. testified that she had told Ms. Monsour that the defendant had touched her inappropriately at her father’s house on Christmas and on Easter; she said that it was true that he did that at Christmas but not true that h2he did it at Easter. She said that the first touching incident did not occur on her dad’s birthday and did not remember saying that during the Gingerbread interview.
Regarding the book fair incident, M.J. explained that when the inappropriate touching occurred, the defendant’s wife was outside doing something in the garden *732 and her brother Cole was playing outside with the dogs. She said that even though this incident in February of 2013 made her afraid of her grandfather, she still agreed to go with him in August of 2013 because she wanted to see his new dog. She explained that the birthday party incident in August 2013 (where the defendant removed his clothes and put his leg on top of her) occurred in the defendant’s bedroom and that he did not touch her private part during this encounter. She said “today’s the- truth” when asked about her conflicting statements during the Gingerbread interview that (1) this event happened in’ the living room, (2) that the defendant' just stood there and didn’t say or ask her to do anything . and that - (3) the defendant touched her private area. . ,
M.J.’s brother Cole was with M.J. at the defendant’s house on the day of the book fair. He testified: “I — after we went to his house, I — I stayed on the couch and was playing on the laptop.” He could not remember if he ever went outside with the dogs. He also said that he. did not see the defendant go off alone with M.J. but did not know where she was the entire time.
R.J. testified about an encounter she had with the defendant at his home:
| isWell, I was laying on the couch and I was sort of laying over his lap and then I asked him to scratch my back and then so he started scratching my back and then he started going tó the side and to the front and so then I just sat up and then I just kind of walked away because I felt uncomfortable so then I just got up.
The defendant did not call any witnesses and did not testify himself.
The jury unanimously voted to convict Mr. Joyner of aggravated incest. .
The defendant filed a motion for post-verdict judgment of acquittal, urging that M.J.’s testimony was too internally inconsistent to serve as evidence to support the verdict. In particular, the defendant pointed out that M.J. told her counselor that (1) the defendant put his penis inside her vagina, (2) the defendant made her squeeze his penis. and (3) the defendant sexually assaulted her at her father’s house on Easter. He also pointed out that M.J. related at least two versions of the event that occurred during her father’s birthday celebration, and that the differences were significant, including inconsistency about (1) the room inside the defendant’s home where the event occurred; (2) whether the defendant touched her private parts and (8) whether the defendant stood in front of her or got on. top of her after taking :his clothes off. Finally, he argued that the “book fair” incident could not have happened the way M.J. described because her brother denied ever going outside the defendant’s home during this time. .
The court denied the defendant’s motion, finding that the jury believed MJ.’s version of events and deciding to give the jury’s finding the deference it was due.
After denying the motion, the court sentenced the defendant to serve | u25 years at hard labor without parole, and further ordered him to pay $30,000 to offset the costs of future counseling for the victim.
Joyner now appeals.
DISCUSSION
By his first assignment of error, the defendant argues that there was insufficient evidence to prove that Maurice Joyner was guilty beyond' a reasonable doubt of aggravated incest. Specifically, he contends that M.J.’s testimony was too internally inconsistent to be worthy of belief. He urges that the discrepancies among the child’s statements to her counselor, the Gingerbread House and at trial, are so *733 substantial that no rational jury could have accepted her testimony as true.
The’standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond á reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App. 2 Cir. 1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833. The. appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App, 2 Cir. 2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. This rule applies equally to the testimony of victims of sexual assault. State v. Robinson, 36,147 (La.App. 2 Cir. 12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App. 2 Cir. 8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490. See also State v. Simpson, 39,268 (La.App/2 Cir. 1/26/05), 892 So.2d 694, Such testimony 'alone is sufficient, even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, supra; State v. Ponsell, supra; see also State v. Johnson, 96-0950 (La.App. 4 Cir. 8/20/97), 706 So.2d 468, writ denied, 1998-0617, (La.7/2/98), 724 So.2d 203, cert. denied, 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999).
At trial, defense counsel skillfully cross-examined M.J., and elicited testimony from her that contained inconsistencies regarding her versions of events. Defendant’s appellate counsel raises the following inconsistencies in this assignment:
• She told her counselor that the defendant put his penis inside her vagina ■ and that he assaulted her at Easter, but admitted neither of these stories were true;
*734 • She told Ms. Flippo that the birthday incident happened in the living room, but testified at trial that this incident happened in the defendant’s bedroom;
• She told Ms. Flippo that, at the birthday incident, the defendant touched her private parts with his hand over her clothes, but testified that he never touched her private parts at all;
• She told Ms. Flippo that the defendant removed his clothes and only stood in front of her, but testified at trial that the defendant got on top of her with one leg on top of her body;
• At the book fair incident, M. J. testified that her grandfather touched her while no other people were inside the house, but M.J.’s brother testified that he and his grandfather’s girlfriend never went outside;
• M.J. said that the first time the defendant touched her inappropriately was on her father’s birthday, but the book fair incident must have happened prior to this date.
The defendant maintains that all of these inconsistencies so discredit the |17victim’s testimony as to render it unworthy of belief.
We recognize that M.J.’s testimony at trial contains inconsistencies and variations to previous versions of the events related to others. Her admission that she falsely told her counselor that the defendant put his penis in her vagina is especially concerning, and, as the defendant points out, M.J.’s “normal” physical examination may or may not be consistent with the victim’s testimony that the defendant put his fingers into her vagina. In other words, the physical examination neither substantiated or unsubstantiated her story. Her testimony included an assertion that the defendant put his entire hand into M.J.’s vagina which is obviously false. Nevertheless, at the time of these incidents in 2013, M.J. was between seven and eight years old.
Regarding some of the chronological inconsistencies, we note that Ms. Flippo explained:
Children in general, early elementary as in ... ten, twelve and under in years are not usually very good with time concepts .... [A]s they get towards that later part, ... ten, twelve years old, they’re going to have a much better concept of has it been a week, has it been a month, has it been a year, things like that. They might remember certain events, birthdays, Christmas, ‘oh, I know it was around the time when ... the Easter bunny came’ or something like that, but they do tend to have a little bit more struggles with time frames. And then, of course, the younger they get, the less they have a grasp of time at all.
[[Image here]]
Very few of the kids I interview have any actual date concepts unless it’s like a teenager and they happen to journal about it. Because also events that happen numerous times the way that our memory works, it doesn’t retain necessarily specific this event versus this event, you know, things that happen numerous times start to run together. Things that we do |isas adults, if we’ve done them over and over, details run together.
After review, we conclude that because the jury had the opportunity to observe M.J. testify and observe her demeanor while defense counsel ably cross-examined her and pointed out each of these inconsistencies to the jury, we cannot say that the inconsistencies are so pervasive that rejection of M.J.’s testimony as competent evidence of the defendant’s guilt is warranted. The child’s testimony about the book fair incident, where the defendant used his *735 hand to rub.the child’s genital.area, was sufficient to prove “lewd fondling ... with the intent to arouse or satisfy the sexual desires of ... the offender” within the meaning of former La. R.S. 14:78.1.
This assignment is without merit.
By his second assignment of error, the defendant contends that the prosecution, in its opening statement, improperly linked possession of pornographic books containing stories of incest between grandfathers and granddaughters to Maurice Joyner, which books were subsequently not admitted into evidence, and which statement resulted in clear and substantial prejudice that requires Mr. Joyner’s com viction to be vacated.
According to the prosecution, the defendant’s biological son, Forrest Joyner, turned over to a police detective a bag of pornographic books he obtained from the deer camp and that the defendant had directed him to destroy. At least one of the books was entitled Family Letters, and it allegedly involved stories of incestuous relationships.
Prior to trial, Forrest became gravely ill and passed away. Presumably, the state planned to use Forrest’s testimony to establish that the |19books belonged to the defendant. According to the prosecutor, Forrest made a DVD (video) where he related how the books belonged to the defendant.
Our review of the pretrial record indicates that on November 26, 2014, counsel for the defendant filed a motion to inspect tangible evidence held by the state, including “a bag containing various books, magazines and written materials that Forrest Joyner delivered to Bossier City Detectives Adams[1] and Jones.” On' December 15, 2014, the state responded that it would permit inspection, of the books by the defense at the Office of the District Attorney. Additionally, in a supplemental discovery response filed on March 20, 2015, the state informed the defense that “[t]he State intends to present the testimony of Forrest Joyner, deceased, as a statement of impending death.”
The state filed a motion in limine to have the DVD containing Forrest’s statement admitted as a “statement of impending death” or “dying declaration,” while the defense filed a motion in limine to exclude “the testimony of Forrest Joyner, deceased, as' a statement of impending death.” The matter was set for and heard on the day scheduled for commencement of trial.
The court ruled that the DVD statement was not a “dying declaration” and admissible as an exception to the hearsay rule. The defense apparently assumed that without Forrest Joyner’s testimony identifying the books as belonging to the defendant, the books could not be admitted into evidence.
lanHowever, during his opening statement, the prosecutor told the jury:
Mr. Lawerence: As the investigation continued they interviewed Forrest Joyner, not gonna say anything about that, but Forrest Joyner gave the police a bag full of books.
Mr. Golden: Objection, Your Honor, may we approach?
In the ensuing sidebar, the prosecutor told the court that Det. Bandy would testify that Forrest Joyner gave her the books. The court deferred ruling on the admissibility of the books and allowed the prosecutor to continue. The prosecutor told the jury that-Det. Bandy would testify that she received a bag of pornographic books from *736 Forrest Joyner that had been stored at the defendant’s- bunk at the deer camp for a long time and “these books were called family letters [sic].” ' • -
The court overruled the defense’s objection. Mr. Lawrence continued:
Mr. Lawrence: These books were called family letters are sexually explicit stories involving the depiction of incestual [sic] sexual relationships between relatives [sic] such as uncle and niece, brother sister, father daughter, grandfather and granddaughter.
■■ ’Mr. Lawrence’ finished his opening statement, and defense counsel then made his opening statement.
Prior to the state’s first witness, Det. Bandy, defense counsel again raised the books issue, and asked the court for a ruling. regarding the admissibility of the books into evidence. He argued that the books were inadmissible because there was no way to link the books to the defendant without the inadmissible hearsay testimony of Forrest Joyner. He also maintained that the prosecutor’s statement to the jury regarding the books l^was highly prejudicial. He said he considered [asking for] an admonitkm, but he felt' that it would just cause more undue attention to the point.
The state’ argued that it could elicit testimony from Det. Bandy that stated only that Forrest Joyner brought the books to her. He said he could elicit testimony from Brian Joyner that the books have been at the deer camp a long time and tie them to the defendant. However, the defense interviewed Brian Joyner who said he had never seen the books in question, and he had only seen magazines like Playboy, Penthouse and Hustler at the deer camp. Defense counsel thus maintained that the state could not.authenticate the books as. .belonging to the defendant because it could not establish a chain of custody, nor could it produce a witness to identify them as belonging to the defendant. . . . • ■ • :-
The court again deferred ruling until the state actually tried to get the books in with a witness on the stand. Ultimately, the books were not' admitted into evidence.
The state again tried to get the books in or a description of their content through an affidavit sworn to by Det. Bandy to obtain a warrant for the defendant's arrest. The affidavit contained a reference to the nature and description of the books and to Forrest Joyner’s statements regarding the books. Ultimately, the court excised those references from the affidavit, except the fact that Forrest Joyner- gave Det. Bandy a bag of pornographic books.
' On appeal, the defendant maintains that the description of the books by the prosecutor in his opening statement was so prejudicial as to require |22that the conviction be vacated.
Article 766 of the Louisiana Code of Criminal Procedure provides:
The opening statement of the. state shall explain the nature , of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.
A prosecutor’s reference during opening statement to evidence that is ultimately not admitted may, in some instances, require reversal. State v. Bell, 279 So.2d 164 (La.1973). The general rule is that, “absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later ruled inadmissible is not a ground for a mistrial.” State v. Green, 343 So.2d 149 (La.1977). The prosecutor’s .statement is not evidence and has no probative force. Rather, it is designed to inform the jury so that they may understand the evidence as it unfolds and to *737 protect the defendant from surprise. La. C. Cr. P. art. 766; State v. Shaffer, 260 La. 605, 257 So.2d 121 (1971); State v. Kreller, 255 La. 982, 233 So.2d 906 (1970).
The state obviously believed that getting the bag of books admitted into evidence was important to its case, as is evidenced by the prosecutor’s persistent alternative attempts to get the. books admitted after the court ruled that Forrest Joyner’s DVD testimony to authenticate was ruled inadmissible hearsay. Thus, prosecutor’s remarks in its opening statement describing the content of the books and linking them to the defendant must either rise to the level of “bad faith” or “clear and substantial prejudice” in order to require mistrial. We do not find that this onerous burden is met in this case. .
There is no evidence of prosecutorial misconduct or bad faith, nor |Mdoes the defense make any argument that the prosecutor acted in bad faith. The record indicates that the prosecutor clearly believed that he would be able to introduce the books evidence by combining the testimony of Det. Bandy, who could testify that-she received the bag of books from Forrest Joyner, and the testimony of Brian Joyner regarding knowledge that there was pornographic material at the' deer camp. Although these witnesses’ knowledge ultimately proved insufficient to support the introduction of the books into evidence, there is no evidence that the prosecutor’s efforts were in bad faith.
While we recognize that the description of the content of the books during opening argument could have been prejudicial to the defendant, we are not convinced it was so substantial as to require a mistrial. We note that defense counsel neither moved for a mistrial, nor. did he. request the court to admonish the jury regarding the prosecutor’s remarks, choosing not to draw additional attention to them. Additionally, the jury heard the testimony of Brian Joyner who said that he could not connect the defendant to any particular books at the deer camp, and Brian also said that he had warned the various other users of the deer camp against bringing explicit material to the camp because of the presence of his children there. Consequently, possession, use, or ownership of the books was never connected to the defendant, and the jury was made aware that the material could have belonged to other users of the camp. Under these circumstances, we conclude that the reference to the excluded evidence does not present reversible error.
|MThis assignment is without merit. ERROR PATENT
Our error patent review demonstrates that the trial judge did not correctly advise the defendant of the delay for seeking post-conviction relief.
Accordingly, this court hereby .advises the defendant that, pursuant to.La. C. Cr. P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction-and-sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922. State v. in Interest of K.S., 50,593 (La.App. 2 Cir. 2/24/16), 188 So.3d 1113.
We also note that the trial court immediately sentenced the defendant without any delay after denying his motion for post-yerdict judgment of acquittal. See La. C. Cr. P. art. 873. However, the defendant has not complained of the error, which appears harmless. See, e.g., State, v. Roberson, 40,809 (La.App. 2 Cir. 4/19/06), 929 So.2d 789, 808.
CONCLUSION
For the reasons stated above, we affirm the defendant’s conviction and sentence.
*738 CONVICTION AND SENTENCE AFFIRMED.