GARRETT, J.
The defendant, Troy Stephenson, was convicted of sexual battery of the teenage daughter of his live-in girlfriend. The trial court sentenced him to 10 years at hard labor without benefit of parole, probation, or suspension of sentence. The defendant appeals, contending that the evidence was insufficient. We affirm the defendant's conviction and sentence.
FACTS
*298 On May 23, 2009, 12-year-old J.B.[1] reported to relatives that a man had grabbed her and touched her breasts, stomach, and vagina at a family party. The Shreveport Police Department ("SPD") was called, and the defendant, a family friend, was arrested. However, the case was eventually closed due to lack of cooperation by J.B.'s family.
On May 28, 2015, the mother of 17-year-old C.H. reported to the police that her daughter had just informed her that the defendant, the mother's live-in boyfriend, had engaged in sexually inappropriate behavior with the girl on several occasions. The defendant was arrested and charged with sexual battery. After the investigating detective learned of the prior incident involving J.B., the defendant was additionally charged with one count of indecent behavior with a juvenile under the age of 13.
On January 10, 2017, the defendant was tried on both charges. The jury acquitted him of the indecent behavior charge involving J.B., but convicted him of the sexual battery of C.H. A motion for post-verdict judgment of acquittal was denied. The trial court sentenced the defendant to 10 years at hard labor without the benefit of parole, probation or suspension of sentence. A motion to reconsider sentence was denied.
The defendant appeals, asserting insufficient evidence to convict him of the charge of sexual battery.
SUFFICIENCY OF EVIDENCE
Law
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 2016-1479 (La. 5/19/17), 221 So.3d 78. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robinson , supra .
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Mitchell , 50,188 (La. App. 2 Cir. 11/18/15), 181 So.3d 800, writ denied , 2015-2356 (La. 1/9/17), 214 So.3d 863. A reviewing court affords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Mitchell , supra ; State v. Eason , 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 2009-0725 (La. 12/11/09), 23 So.3d 913, cert. denied , 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Crossley , 48,149 (La. App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied , 2013-1798 (La. 2/14/14), 132 So.3d 410 ; State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , *299 2009-0372 (La. 11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Johnson , 47,913 (La. App. 2 Cir. 4/10/13), 113 So.3d 1209.
The testimony of the victim alone in a sexual assault case is sufficient to convince a reasonable fact finder beyond a reasonable doubt of a defendant's guilt. State v. Rives , 407 So.2d 1195 (La. 1981) ; State v. Sanderson , 49,957 (La. App. 2 Cir. 7/22/15), 174 So.3d 149 ; State v. Wade , 39,797 (La. App. 2 Cir. 8/9/05), 908 So.2d 1220, writs denied , 2006-0109, 2006-0148 (La. 6/2/06), 929 So.2d 1251. Furthermore, such testimony alone is sufficient, even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense by the defendant. State v. Wade , supra .
In pertinent part, La. R.S. 14:43.1 provides:
A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, ... when any of the following occur:
(1) The offender acts without the consent of the victim.
Testimony
In her trial testimony, C.H. recounted a series of sexually inappropriate incidents involving the defendant that occurred during the approximately two-month period that they lived in the same house. They all occurred at night while her mother, a personal sitter, was at work, and her two younger sisters were in their bedroom. During the first incident, which occurred in the kitchen, the defendant engaged C.H. in a conversation about sex.[2] He showed her how to use a condom, first by putting it on a banana, then on a wrench he produced from under the kitchen sink. He then encouraged the girl to masturbate with the condom-covered tool. In an attempt to "wave the conversation away," C.H. accepted the tool but excused herself to go take her shower and get ready for bed. While she was showering, the defendant entered the bathroom uninvited. After a brief conversation, he peeked behind the shower curtain at her and asked if he could shower with her. She told him to get out. She did not tell anyone about the incident.
The next time C.H. was alone with him, she was washing dishes in the kitchen. During a discussion about exercising and gyms, she indicated that she wanted to exercise to improve her health. The defendant offered to help her train. They did sit-ups and squats on opposite sides of the bedroom he shared with her mother. After a few days, the defendant moved over to the side of the room where she was exercising. He held her feet down while she did sit-ups. On one occasion, while holding her feet down, he told C.H. that she never smelled bad, and then put his head near her crotch and sniffed. Although shocked and uncomfortable, C.H. said nothing. On another occasion, when she was doing squats, the defendant came up behind her close enough for her to feel that he had an erection. Disgusted, she told him it was late and she had school in the morning.
*300 After that, she skipped exercising for several days until the defendant noticed and wanted to resume. After an exercise session, the defendant said he wanted to give her a massage so she would not be sore from the workout. C.H. testified that she was afraid to refuse. The defendant asked her to remove her gym shorts, leaving her clothed in her underwear and a shirt. He instructed the teenager to lie on her back on the bottom of the bed and rubbed baby oil on her thighs, legs and feet. He then asked her to roll over on her stomach. He proceeded to work his way up her legs. He massaged her buttocks and put his fingertip between her inner thighs before touching her "private area." Shocked, she told him he could stop, got up, and said good night. After that, she stopped exercising and talked to the defendant less often.
The final incident occurred when the defendant "really wanted" C.H. to watch a movie with him in the bedroom he shared with her mother. Although she initially watched the movie while seated at the end of the bed, he encouraged her to get under the covers, like him, so she would not be cold. At first, they merely talked about the movie. He then began to move closer to her, told her to be still, and put his hand on her shoulder. C.H. said she was afraid to move. The defendant first rubbed his fingertips on her leg, then went through her gym shorts and put his finger in her vagina. He moved his finger in and out, asking her if she felt that. Scared, C.H. said nothing. But she jumped out of the bed and went back to her bedroom. She never went in the defendant and her mother's bedroom again.
C.H. candidly admitted that she never really liked anyone her mother dated, including the defendant. After her family first moved in with him, her mother encouraged her to "lighten up" and not be "so mean" to the defendant.[3] To please her mother, C.H. made an effort to talk to the defendant more often. When asked why she did not tell her mother about the defendant's inappropriate behavior sooner, C.H. explained that she did not want to ruin her mother's relationship with the defendant because he made her mother happy. She believed that if she kept "waving" off the defendant's behavior, it would stop. When her mother told her that they were going to move out of the house, C.H. thought she could avoid upsetting her mother by never telling her what had happened. However, when the defendant's daughter subsequently informed her that her mother was reconsidering moving out, C.H. realized that she had to tell her. Just before her mother was due to leave for work, C.H. texted her to come to her bedroom. After she revealed what the defendant had done to her, her mother began to cry and told her that she knew she was telling the truth. After showing her daughter an open condom she had found in her own closet, she looked under the kitchen sink and found a tool similar to the one C.H. described. Her mother then gathered up all three of her daughters, as well as the defendant's teenaged daughter, and took them to her place of employment. She called the police from there.
T.W., C.H.'s mother, testified that her daughter had described three incidents to her when telling her about the defendant's actions. One occurred in the kitchen when C.H. was talking to him and she noticed that he was fondling himself. Another involved him rubbing and smelling C.H. while exercising and saying he was glad she took a bath. The third involved him picking C.H. up while she was washing dishes. Although T.W. did not initially *301 mention in her testimony the incident in the kitchen with the condom and the tool, she later indicated that C.H. told her about it and described finding objects that corroborated the girl's account. The condom wrapper her daughter described was for the same sort of condom that T.W. and the defendant used. A few days after C.H. made her revelations, T.W. asked her for a more detailed description of the tool. They eventually found the tool, but T.W. testified that she threw it away. T.W. also stated that she obtained a restraining order against the defendant, which forced him to move out of the house they were renting together. After he left the house, C.H. disclosed more details to her, including instances when he would come into a room where she was and would "shake hisself." He would put his hand in his clothes and wiggle "his private" around. C.H. told her mother that she tried to ignore him. T.W. admitted that, at some point, she had noticed that C.H. didn't want to be in the same room as the defendant.
Detective Deandre Belle, who was assigned to the SPD sex crimes unit, testified that he followed up on the initial report made by T.W. He contacted them on June 1, 2015, and interviewed them the following day. C.H. recounted the incident where the defendant tried to talk to her in the kitchen about sex. She told him that she then went to shower and that the defendant came in the bathroom, pulled back the shower curtain, and saw her naked. According to the detective, she told him that she would do sit-ups in her room and that the defendant asked her to come in his bedroom for a massage. She told him that the defendant rubbed her leg, then went underneath her shorts, and put his finger in her vagina.
Discussion
The defendant contends that inconsistencies surrounding C.H.'s testimony mean that she merely "made up" the incidents because she did not like him and did not want her mother to stay with him. As a result, he argues that there was one reasonable theory that should have precluded the jury from finding him guilty and, as a result, this court should reverse his conviction.
Review of the evidence in the light most favorable to the state supports the sexual battery conviction. If believed, C.H.'s testimony alone supports the verdict. The jury was free to weigh the evidence and make a credibility determination about C.H's claims after considering any inconsistencies in her testimony regarding when the illegal touching occurred. Great deference is given to a jury's decision to accept or reject the testimony of a witness in whole or in part, and this court will not reevaluate the credibility of witnesses or reweigh the evidence.
C.H. reported multiple incidents occurring over a period spanning almost two months, a factor which could have contributed to some confusion on her part as to details and timing. Due to defense counsel's thorough cross-examinations, the jury was well aware of the inconsistencies between C.H.'s testimony detailing the defendant's sexually inappropriate actions against her and the testimony of her mother and the investigating detective recalling her descriptions of those events to them. The jury could have reasonably believed that C.H. did not provide her mother with full disclosure of the events in order to protect her. These inconsistencies are not sufficient to warrant the rejection of C.H's testimony as competent evidence of the defendant's guilt. See State v. Berry , 51,213 (La. App. 2 Cir. 5/17/17), 221 So.3d 967 ; State v. Joyner , 50,740 (La. App. 2 Cir. 6/22/16), 197 So.3d 724, writ denied , 2016-1493 (La. 6/16/17), 219 So.3d 1111.
*302 Despite any inconsistencies in C.H's reports regarding the timing of the events, she consistently reported to the detective that the defendant touched and even digitally penetrated her vagina with his fingers. Evidence that the defendant touched and digitally penetrated C.H.'s vagina is sufficient proof that he was guilty of the crime of sexual battery. State v. Ordonez , 16-619 (La. App. 5 Cir. 3/15/17), 215 So.3d 473 ; State v. Gonzalez , 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227 ; State v. Perkins , 11-162 (La. App. 5 Cir. 12/28/11), 83 So.3d 250.
Consequently, after viewing the evidence in the light most favorable to the prosecution, we find that C.H.'s testimony that the defendant committed a sexual battery on her was sufficient to support the defendant's conviction. This assignment of error lacks merit.
ERROR PATENT
The minute entry for the defendant's sentencing states that he was "FOUND GUILTY OF COUNT #1 INDECENT BEHAVIOR WITH JUVENILES." However, the defendant was found guilty of Count 1, which was sexual battery, and acquitted of Count 2, which was indecent behavior with a juvenile under the age of 13. Accordingly, we direct the trial court to correct the minutes to accurately reflect the offense for which the defendant was sentenced.
CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.

The victims in this matter will be referred to by their initials for confidentiality purposes in accordance with La. R.S. 46:1844(W).

This conversation occurred immediately after the defendant discussed chores with C.H. and her sisters and told them that he wanted to be a father figure to them. After the younger girls left the kitchen, the defendant began talking to C.H. about her father, who was incarcerated. He then began questioning C.H. about her sexual experiences.

In her testimony, the mother clarified that she felt C.H. was "mean" to the defendant because she would not talk to him when he attempted to engage her in conversation.