BROWN, Chief Judge.
1) Defendant, Christopher D. Taylor, who waived a jury in favor of a bench trial, was convicted of the second degree murder of his girlfriend, Marshiva Little, and was subsequently sentenced to serve life imprisonment without the benefit of parole, probation or suspension of sentence. Defendant has appealed his conviction asserting only that the evidence was insufficient to convict. For the following reasons, the defendant’s conviction and sentence are affirmed.

Trial Testimony

Marshiva Little was shot on July 22, 2008, but survived at LSU Hospital until July 31, 2008, when she passed away from her injuries. On November 7, 2011, defendant’s bench trial commenced with the testimony of Dr. James Traylor, an expert in forensic pathology. Dr. Traylor testified that he conducted an autopsy on the victim, Marshiva Little, on July 31, 2008. Dr. *407 Traylor opined that Ms. Little’s death was caused by a gunshot wound to her left eye.
Specifically, Dr. Traylor explained that the bullet entered Ms. Little’s body through her left eye, perforated her left maxillary sinus and then fractured her third, fourth and fifth cervical vertebrae. The bullet’s entry into her fifth vertebra lacerated her cervical spinal cord. According to Dr. Traylor, the only way the bullet could have hit three cervical vertebrae yet penetrated only the fifth one would have been if the victim had her head bent over with her chin almost touching her chest. Dr. Traylor noted that the bullet’s trajectory was at a downward angle, from left to right. Given the absence of burning or soot within the wound track and lack of tattooing |2at the point of the bullet’s entry, Dr. Traylor opined that the discharging weapon was at least 18 inches away from the victim’s face when she was shot.
Dr. Traylor took photographs of an abrasion over Ms. Little’s right cheek and eye during his autopsy. Dr. Traylor also photographed an abrasion on the victim’s left hand near her knuckle, several on her right forearm and some other abrasions on her feet. Dr. Traylor did not find any abrasions on the palms of Ms. Little’s hands. According to Dr. Traylor, had Ms. Little survived the gunshot wound, she would have been a quadriplegic. According to Dr. Traylor, defendant’s statement to the police that the gun went off when the victim dropped it on the pavement as she exited his vehicle was not probable given the trajectory of the bullet. Dr. Traylor explained that a more likely scenario was one in which Ms. Little was outside of the vehicle and bending in to reach her belongings when she was shot.
The state called James Edwin Clark, Jr., an expert in firearms operation, maintenance and repair, as its next witness. Clark testified that he was given a Hi-Point firearm by the Shreveport Police Department to determine whether the firearm’s safety mechanisms were fully operational. Clark explained that the Hi-Point .380 firearm had two safeties to prevent it from discharging when it was struck from either the top or the bottom side. In other words, the Hi-Point .380 had what is referred to as a “drop safety.” Clark testified that he conducted testing on the firearm and concluded that the mechanical safeties were fully functioning as designed by the [.-¡manufacturer. Clark therefore opined that the Hi-Point .380 would not discharge if dropped from a height of ten feet or less. On cross-examination, Clark stated that he struck the gun with a piece of lead to test its safeties, but never dropped the gun on pavement. Clark testified that the harder a firearm such as the Hi-Point .380 is struck or dropped, the more functional or engaged its safeties become.
The state called criminalist Richard Beighley, an expert in firearms identification and analysis. Beighley explained that he received a Hi-Point .380, a corresponding magazine and a bullet, for testing. Beighley tested the Hi-Point .380 and determined that its safeties were fully functional. Beighley related his conclusion that the fired cartridge case found at the scene had been fired from the Hi-Point .380 firearm. However, Beighley was not able to determine, one way or the other, whether the bullet provided by the Shreveport Police Department was fired from the Hi-Point .380.
The state called Willie Mae Little, the victim’s mother, as its next witness. Willie Mae testified that she was with Marshiva Little at the Child Protection Services Office in Bossier City, Louisiana, on the morning before she was shot. Willie Mae stated that defendant and the victim’s chil *408 dren were also there. Her daughter and defendant left the office together alone.
Later that day (July 22, 2008), Willie Mae was informed that her daughter had been shot and immediately went to LSU Hospital to be with Marshiva. Willie Mae stayed with her daughter until she died nine days later at the age of 27. Willie Mae stated that she is now raising three of her daughter’s children.
LBeverly Lake, an assistant to Dr. Kenneth Bonnette, Jr., a dentist at Willis-Knighton Hospital, testified that on July 22, 2008, at around 5:30 p.m., she was driving Dr. Bonnette home because his children had borrowed his car. They were in the area of Dr. Martin Luther King Boulevard in Shreveport. Ms. Lake stated that after driving up a little hill in the road, she saw a woman lying in the turn lane in the middle of the street behind a gray vehicle. Ms. Lake stopped her car so that she and Dr. Bonnette could help the woman. When Ms. Lake and Dr. Bon-nette approached the victim, they could see that she had blood coming from her mouth and her eye was injured. Ms. Lake tried to direct traffic around the scene. Ms. Lake stated that the only verbally coherent statement that the victim made was, “Help me, please help me.”
Ms. Lake testified that there was a man in a bright yellow shirt at the scene, but he did not identify himself to her or Dr. Bon-nette. Ms. Lake further stated that the man neither came toward the victim nor spoke, but just walked around the car and fumbled around near both sides of the vehicle, “getting something or doing something-in the car.”
The police then arrived and Ms. Lake told them that the victim and the man in the yellow shirt by the vehicle were there when she and Dr. Bonnette arrived. The man began walking around the police cars while Ms. Lake was identifying him to police and he was detained by one of the officers.
While Ms. Lake was standing at the scene, she stated that she heard a noise, like a piece of metal hitting the ground. Right after hearing this | .¡noise, she looked over and saw a firearm lying on the ground three or four feet from Little’s body, not far from where the man in the yellow shirt was standing.
The state called Dr. Kenneth Bonnette, Jr., the dentist who had stopped to render aid with Ms. Lake, as its next witness. Dr. Bonnette corroborated Ms. Lake’s version of the facts, including the victim’s plea for help. Dr. Bonnette also stated that the victim was lying on her side on the pavement close to the vehicle which was stopped in the middle of the highway. Dr. Bonnette did not recall seeing a firearm near Little’s body while he was rendering aid. Dr. Bonnette did remember an African American man wandering around the stopped vehicle and in the general area. Dr. Bonnette stated that he never heard the man make any statements. Only after he began to leave the scene did Dr. Bon-nette notice a firearm on the road, about 15 yards from the victim’s body.
Oberlyn Washington testified that on July 22, 2008, at approximately 5:30 p.m. she was driving on Martin Luther King Boulevard headed to the grocery store. Ms. Washington encountered a vehicle in the middle of the road and noticed a woman lying next to it. Ms. Washington slowed down and pulled over to the side. The woman, Marshiva Little, was lying there while a white male was attempting to make her comfortable. Ms. Washington also saw a white female assisting the white man and an African American male who was pacing in the street. Ms. Washington testified that she tried to comfort the victim. The African American man asked *409 Ms. Washington if she would talk to a 911 operator and give their location. He | (jhanded her a cell phone. The African American male then stated that Ms. Little had shot herself, and he made a phone call on another cell phone. Ms. Washington took the phone and told the 911 operator the exact location of the scene.
The police soon arrived and the African American man told them that Ms. Little had shot herself. Ms. Washington noticed that after the African American male had made this statement to the officers, Ms. Little said, “No,” and shook her head from side to side. Ms. Washington, in open court, identified defendant as the African American at the scene of the shooting.
Corporal Lonnie Haskins with the Shreveport Police Department testified that he responded to the scene. Officer Haskins explained that prior to his arrival, he was informed that there was a “BOLO” or “be on the lookout” for a male driving a vehicle in which he was hitting a female passenger in the area of Martin Luther King Boulevard. Officer Haskins confirmed that the vehicle and license plate number relayed in the domestic violence call matched up with the silver Hyundai Sonata found at the scene of the shooting. When Officer Haskins arrived, he saw Ms. Little lying in a pool of blood. She appeared to be choking, but was trying to talk. Officer Haskins called for an ambulance and a crime scene unit to investigate.
Officer Haskins talked to defendant, who said he had been with the victim and it was Officer Haskins’ opinion that defendant did not seem to be concerned about Ms. Little’s condition. Officer Haskins detained defendant in the back of Officer Dobbins’ police vehicle. Defendant told Officer Haskins that the shooting was an accident.
17Sheree McCallon was the state’s next witness. Ms. McCallon stated that she was driving down Martin Luther King Boulevard on July 22, 2008, when she noticed two occupants in the vehicle in front of hers who looked like they were involved in a physical altercation. She observed the man in the vehicle hitting the woman and slamming her head into the dashboard. Ms. McCallon honked her horn at the man and he stopped. The woman inside the car was trying to push the man away from her. The man then turned left and Ms. McCallon followed. The man began hitting the woman again and Ms. McCallon called 911. She gave the 911 operator the color, make, model and license plate number of the vehicle she was following and related what she had witnessed. The vehicle pulled into a parking lot and Ms. McCallon stopped by the side of the road past the parking lot where she could look back at the car. Ms. McCallon recalled, after listening to a recording of the 911 call, telling the 911 operator that the man was “beating the crap” out of the woman. At some point she lost track of the car she had been following. Ms. McCallon was not able to identify the driver of the vehicle.
Corporal Skylar VanZandt with the Shreveport Police Department, an expert in crime scene investigation and latent fingerprint examination, testified that he responded to the scene of the shooting. Corporal VanZandt first photographed the scene as he found it upon his arrival, moving nothing. He explained that a handgun was on the ground, as was the magazine for that handgun and two live cartridges. There was also a spent cartridge |8under the vehicle that was parked in the middle of the street. Corporal VanZandt also made a diagram of the scene.
Corporal VanZandt testified that he found a couple of handbags, a comb and a disposable camera on the passenger seat of the car. Corporal VanZandt also recov *410 ered a Hi-Point .45 caliber firearm from between the driver’s seat and console area. Corporal VanZandt explained that although he searched the Hi-Point .380 firearm for fingerprints, he could find none.
On cross-examination, Corporal Van-Zandt admitted that there was no physical evidence proving that a firearm had been fired in the vehicle. He noted that there was no blood found inside the car.
Detective Greg Rudell, another Shreveport Police Officer who responded to the shooting, testified that once on the scene he was informed that the victim had been transported to LSU Hospital and that defendant was being detained for questioning. Detective Rudell later identified the victim as Marshiva Little and learned that she was in critical condition. Detective Rudell testified that he knew of Ms. Little’s condition when he interviewed defendant.
Detective Rudell corroborated Officer Haskins’ testimony that the silver Hyundai Sonata was the same vehicle that had been mentioned earlier in a BOLO-alert regarding a domestic abuse situation.
Detective Rudell, along with Detective Cromer, then interviewed defendant after he was advised of his Miranda rights and signed a waiver of rights form. Defendant’s statement was played in open court. Defendant stated that he and Marshiva Little were headed to his mother’s house when |9an old friend called his cell phone. Defendant claimed that Ms. Little then started hitting him. Defendant stated that he then stopped the car in the middle of the street to let Ms. Little out. Defendant claimed that Ms. Little grabbed the Hi-Point .380, stepped out of the car and lost her balance. At that time the gun fell and discharged. According to defendant, Ms. Little was falling as the firearm fell and went off. During the interview, defendant requested that his hands be tested for gun powder residue.[1]
Following the interview, Detective Ru-dell charged defendant with aggravated battery. On July 31, 2008, after the victim died from her injuries, defendant’s charges were upgraded to second degree murder. Following Detective Rudell’s testimony, both the state and defense rested.
After closing arguments, the trial court found defendant guilty as charged of second degree murder.
Prior to imposition of sentence, the trial court denied defendant’s “Motion for Post-Verdict Judgment of Modification.” The defense then stated that it was prepared for sentencing. The trial court noted that it was obligated to sentence defendant to life imprisonment without the possibility of parole, probation or suspension of sentence. The trial court explained that it had reviewed La. C. Cr. P. art. 894.1 prior to sentencing and had discovered no basis for deviating from the mandatory life sentence.

_J¿^Discussion

According to defendant, the evidence adduced at trial was insufficient to convict him of second degree murder. Defendant argues that the only evidence presented was circumstantial in nature and that the state failed to refute his reasonable hypothesis of innocence, i.e., that Marshiva Little accidentally shot herself. In support of his claim, defendant cites the expert testimony of Dr. James Traylor, who opined that while it was improbable, given the trajectory of the bullet, that Marshiva Little shot herself when the firearm dis *411 charged on the pavement, it was not impossible. Additionally, there was no physical evidence that the firearm was discharged in the vehicle. Defendant also points out that James Clark, the gunsmith expert, never dropped the Hi-Point .380 to test its safeties. According to defendant, the police failed to conduct a gun powder residue test on his hands. Finally, defendant argues that his actions following the shooting were not indicative of a guilty conscience.
La. R.S. 14:30.1(A)(1) provides that second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.02/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App.2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App.2d Cir.05/09/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Viewing the evidence in a light most favorable to the prosecution, the evidence adduced at trial was sufficient to convict defendant of second degree murder. Defendant admitted to being in the car with Marshiva Little when she was shot. Sheree MeCallon testified at trial that she saw a man in defendant’s vehicle in the area where the shooting occurred, beating a woman just prior to Ms. Little’s shooting.
Additionally, although defendant told police (and maintains on appeal) that Marshiva Little dropped the Hi-Point .380 and accidentally shot herself, the physical evidence and testimony of witnesses do not support such a theory. Dr. Traylor testified during defendant’s trial that the bullet that killed Marshiva Little traveled through her left eye at a downward angle to her cervical vertebrae. This downward trajectory, Dr. Traylor explained, did not support a scenario in which the gun went off accidentally upon hitting the ground. Dr. Traylor also opined that the firearm would have had 112to be at least 18 inches from Ms. Little’s face, and therefore it was unlikely that she shot herself. Dr. Traylor instead testified that a more likely scenario would have been that Ms. Little was reaching into the car when she was shot. Corporal VanZandt found the victim’s handbag on the front passenger seat.
Additionally, James Clark, the gunsmith expert, and Richard Beighley, another firearms expert, both conducted testing on the Hi-Point .380 firearm and independently concluded that both safeties were fully functional.
The trial court had the opportunity to assess the credibility of the witnesses and weigh the evidence, and this court affords its findings great deference. Viewing physical evidence and testimony in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*412
Conclusion

For the foregoing reasons, defendant’s conviction and sentence are affirmed.

. As Detective Rudell explained, SPD uses gunshot residue tests as "props” or as an investigative technique in the interview process, not for any evidentiary purposes. The reason is that GSR tests are not reliable, as lots of false positives are produced.