50,861 (La.App. 2 Cir. 9/28/16)
**STATE of Louisiana, Appellee**

v.

**Derrick L. ROSE, Appellant**

**No. 50,861-KA**

Court of Appeal of Louisiana,
Second Circuit.

Judgment rendered September 28, 2016

years at hard labor. La. R.S. 14:27(D)(3) and

La. R.S. 14:31(B).

JULIE C. TIZZARD, Counsel for Appellant

JOHN McINTOSH LANCASTER, District Attorney, PENNY W. DOUCIERE, KENNETH DOUGLAS WHEELER, Assistant District Attorneys, Counsel for Appellee

Before BROWN, DREW and PITMAN, JJ.

DREW, J.

Derrick L. Rose was charged with three crimes: one count of attempted first degree murder (La. R.S. 14:30 and 14:27), and two counts of second degree kidnapping (La. R.S. 14:44.1). After a consolidated trial, the jury returned a responsive verdict of guilty of attempted second degree murder (La. R.S. 14:30.1 and 14:27) and guilty as charged on the two counts of second degree kidnapping.

Rose, a first felony offender, was sentenced to 30 years at hard labor for each of the three crimes, with all sentences to be served concurrently.

He now appeals, alleging: (1) insufficiency of the evidence, (2) improper limitation on his right to impeach a witness, and (3) excessive sentences.

We affirm each conviction. We remand each case to the trial court:

- To rule on the pending motion for reconsideration of sentences; and
- To determine what portions of the two kidnapping sentences are to be served without benefits.

**BACKGROUND**

Becky Zeno ("Becky"), a teacher, and Derrick Rose ("Rose"), an oilfield worker, had a rough six-year history, producing a daughter, B.R., in 2009. In 2012, Becky caught Rose cheating with "Alicia." She admitted cutting up his clothing, keying his car, and pawning some of his belongings. In early January 2014, Rose forced Becky to drive around all night, discussing their relationship and infidelities. Becky did not report the incident to police.

In mid-January 2014, Becky moved in with her sister, Myra Zeno, at a Monroe apartment complex. In late January, Rose took Becky from Myra's apartment against her will, and forced her to go with him to Winnsboro, where they stopped to visit Rose's grandmother. Becky told Rose's grandmother that Rose had kidnapped her, but Rose's grandmother just laughed. Once again, Becky did not report the incident to police.

Becky reserved a motel room for the two ex-lovers in February 2014. Becky's stated reason was to assist Rose in seeing his daughter. Rose claimed that the room was rented because the two were still intimate.

In mid-March, Rose showed up at Myra's apartment, demanding Becky's cell phone. When Becky refused, he grabbed her purse. Becky held on. Rose dragged her out of the apartment and down the stairs. He left only when Myra threatened to call the police. Myra took photos of Becky's injuries and testified about the incident at trial.

In the days leading up to April 4, 2014, Rose and Becky exchanged a series of text messages. His texts questioned her fidelity. He sent other offensive and threatening messages. The last two text messages from Rose to Becky, dated April 3, 2014, read: "Becky I swear on everything s\*\*t is going to get real!" and "I don't care about nothing at all anymore." Becky blocked Rose's number after that, though the two continued to exchange emails about him wanting his TV back.

## EVENTS ON THE DATE
## OF THESE CRIMES

On April 4, 2014, Becky and B.R. were leaving for school when Rose used a truck to block her from leaving the complex. He exited the truck, took her keys, made Becky move to the passenger seat in her Ford Edge, and drove away with his two hostages.

Initially, Rose told Becky that they were heading to his mother's house in Winnsboro. He told Becky to call and request the day off, which she did. During the drive, Rose and Becky argued about his current girlfriend, her current boyfriend (if any), and why she refused to show Rose her cell phone.

Luckily for the victims, Myra saw the abduction and called 911. Monroe Police Detective Mark Huggins and others quickly arrived at the apartments. They soon launched a search for the threesome, assisted by pinging the location of Rose's cell phone.

During the drive, Rose was called by the Monroe Police Department, telling him that they knew what he was doing. After the phone call, Rose turned onto McMillan Road, in rural Richland Parish, parking the Ford behind a bush. He then got into the back seat with the others. Becky was in the middle.

During the arguing, Rose got a phone call from his cousins, Laquisha Dorsey and Frantonio Smith, who were concerned that Rose was "all over the news" and that police were looking for him. Dorsey spoke with Becky, who said she and B.R. were not hurt and were fine. Dorsey heard sirens and the connection was quickly broken. At that point, Rose grabbed his 9mm firearm.

Based on tire tracks and cell phone data, Lt. John Flowers, Richland Parish Sheriff's Office, and Agent John Miller, Louisiana Department of Wildlife and Fisheries, found them. Flowers approached from one side, Miller from the other.

Rose and Becky began scuffling over the firearm. The gun fired, sending a bullet through the rear passenger side window (over the head of the child). The gun fired again, this time hitting Becky's finger. Seconds later, the gun "flew out" of the damaged rear passenger side window. The two officers sped up their approach as Rose was dragging Becky out of the vehicle. He was holding her around the neck, with his right hand behind her, as if to suggest that he had another weapon. As he dragged Becky away, she lost consciousness. The officers quickly arrested Rose and revived Becky. The victims were taken to the hospital.

Later that day, Detective Roy Williams, a Richland Parish sheriff's investigator, explained to Rose his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and then interviewed him at the Sheriff's Office. Monroe Detective Huggins was present.

With the consent of Becky's family, B.R. was taken to the Children's Advocacy Center in Monroe, where she was interviewed by Jennifer Graves. The child's interview was observed by Monroe Police Department Detective Susan McMillan.[1] B.R. stated:

- Rose got into her mom's car when they were leaving for school;
- she heard Rose tell Becky to unlock the car;
- she saw that Rose had a little black gun when he got in the car;

1. After a hearing, the trial court found the recording of this interview to be admissible under La. R.S. 15:440.4 and 440.5. The CD of the interview was identified and authenticated by Det. McMillan, and played before the jury.

- she heard Rose demand Becky's phone several times;
- Rose finally stopped the car and got in the back seat with the others;
- the two grownups weren't yelling, but they fought; and then
- Rose shot and "killed" Becky's finger.

### EXCERPTED TRIAL TESTIMONY

**Detective Casey Baker,** a crime scene investigator for the Monroe Police Department, presented and discussed the crime scene photographs and evidence harvested at the scene. He explained:

- he found one 9mm gun outside the white Ford Edge;
- the back passenger side window of the vehicle was blown out;
- two spent shell casings were in the car; and
- an earring was found fairly close to the car, near where Becky collapsed.

**Becky Zeno** testified about her violent relationship with Rose. She then recounted the incident of April 4, 2014, stating:

- Rose waved his gun at her and tapped it against her window before he got into her car at the apartment complex;
- she did not voluntarily go with Rose;
- Rose repeatedly threatened her life, saying, "I'm going to drop [B.R.] off at your mom's house and then I'm going to kill you";
- He aimed his gun at her, but shot through the window;
- she started wrestling Rose for the gun, when it went off a second time, hitting her finger;
- Rose then placed the gun in his mouth, but she was able to grab the weapon and throw it out the window; and
- when Rose took her out of the car, he told police not to come any closer or

he would shoot her again, all while holding his hand behind her back.

**Agent Miller** and **Lt. Flowers** testified that (1) Rose had his arm around Becky's throat, with his other hand behind her; (2) this looked as if he had another weapon; and (3) he threatened to shoot Becky again if they came closer.

**Vickie Williams,** the principal of Lincoln Elementary School, testified that (1) Becky sounded nervous on the phone; (2) she knew something was wrong; (3) Becky was usually very reliable and forthcoming; and (4) she thought it odd that Becky gave no explanation as to her requested absence for that very day.

**Myra Zeno** testified:

- she was about to leave her apartment on the morning of April 4, 2014;
- she heard and answered a neighbor's knock at the door;
- she was told that Rose had taken Becky and B.R. at gunpoint; so
- she called the police, who initiated search efforts.

**Alisha Davis** testified that she and Rose were dating in 2012, while Rose and Becky were together. Further, Becky contacted her in February 2012 via Facebook, wanting to tell her about Becky and Rose's relationship. Rose's counsel attempted to question Davis about the contents of the Facebook message. The state objected. Defense counsel argued that the information was in the form of character impeachment, and was specifically meant to show that Becky lied when she testified that she never threatened to physically harm Rose. The trial court sustained the state's objection, explaining that the proximity in time was too remote and was not sufficiently related to the present incident. The trial court did allow questioning for the purpose of a proffer.[2]

---

**2.** The proffered message: "I swear I'll f**k his skinny stupid lying ass up."

With the jury back in the courtroom, Davis testified that she was sure that Becky had keyed Rose's car, apparently out of jealousy.

[7]The defense recalled Becky, and used the statement Becky gave to police on April 8, 2014, for impeachment purposes, noting two inconsistencies.[3]

**Gabriell Elmore** testified:
- she was an eyewitness to the series of events that took place at the Parish Square apartments on the morning of April 4, 2014;
- she saw a black male talking to the driver of a white car;
- she saw the black man get into a red truck and park it in the lot;
- she saw the black man get into the driver's side of the SUV;
- she saw the vehicle drive away, but never saw a weapon;
- she was 20-30 feet away and initially was not paying full attention;
- at first, she did not call the police, as she didn't want to be involved;
- she heard no screaming and saw no panic; and
- later, she did call the police after one of Rose's friends called her.

**Derrick Rose** agreed with the previous testimony, with these exceptions:
- B.R. never told him that she wanted out of the car;
- Rose never waved or brandished the gun at Becky before he got into Becky's car at the Parish Square apartments;
- Rose never threatened Becky's life;
- Rose told Becky and B.R. to leave before the police arrived, not once they were on the scene;

[8]• Rose took his gun and placed it in his mouth, and Becky tried to pull it out of his mouth and take the gun from him;
- during the struggle, he accidentally shot Becky; and
- while he was holding Becky outside the car, he did not say, "Do not come any closer, I'm going to shoot her again."

An 11-1 jury rendered three verdicts of guilty as noted before. After a presentence investigation, the trial court fixed a sentence of 30 years at hard labor on each crime, with all sentences to be served concurrently.

Motions for new trial and post-verdict judgment of acquittal were denied.

## DISCUSSION

### I. SUFFICIENCY

Rose argues:
- The trial evidence was insufficient to support any conviction;
- the state failed to prove that Becky did not consent to go with Rose;
- the jury did not give enough weight to the testimony of Ms. Elmore;
- Becky agreed that Rose told them to leave before the shooting;
- the various testimonies were full of inconsistencies;
- Becky's testimony was inconsistent about the gun struggle;
- the gun went off by accident; and
- he intended to harm himself, and no one else.

The state responds that the evidence of guilt is overwhelming, and the jury's credibility call should not be disturbed.

---

**3.** Becky initially told police that she exited the car before Rose drove toward Winnsboro, but she did not, in fact, get out of the car until Rose dragged her out on McMillan Road; and she conceded telling the police that Rose put the gun in his mouth before the second shot, but admitted at trial that her sequential recollection may not be correct.

Our law on appellate review of sufficiency questions is well settled.[4]

### Attempted Second Degree Murder

La. R.S. 14:30.1, second degree murder, states in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm;

La. R.S. 14:27, Attempt, states in pertinent part:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Therefore, the state must prove that the defendant (1) intended to kill the victim, and (2) committed an overt act tending toward the accomplishing of the victim's death. *State v. Bishop*, 2001–2548 (La. 1/14/03), 835 So.2d 434.

A conviction for second degree murder can be based upon the specific intent to kill *or* to inflict great bodily

---

4. Appellate review for sufficiency of the evidence questions whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Hearold*, 603 So.2d 731 (La.1992).

"Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts." *State v. Kempton*, 01–572 (La.App. 5th Cir. 12/12/01), 806 So.2d 718, 722. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the (circumstantial) evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Captville*, 448 So.2d 676, 678 (La.1984); *State v. Jones*, 00–980 (La.App. 5th Cir. 10/18/00), 772 So.2d 788, 791. This is not a separate test from the *Jackson* standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *State v. Harrell*, 01–841 (La.App. 5th Cir. 2/26/02), 811 So.2d 1015.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So.2d 471 (La.1983); *State v. Bell*, 50,092 (La.App. 2d Cir. 9/30/15), 179 So.3d 683.

A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La.App. 2d Cir. 8/30/02), 827 So.2d 508, *writ denied*, 2002–3090 (La. 11/14/03), 858 So.2d 422. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La.App. 2d Cir. 9/18/02), 828 So.2d 622, *writs denied*, 2002–2595 (La. 3/28/03), 840 So.2d 566, 2002–2997 (La. 6/27/03), 847 So.2d 1255. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Casey*, 1999–0023 (La. 1/26/00), 775 So.2d 1022.

harm. *Attempted* second degree murder requires proof of the specific intent to kill. *State v. Huizar*, 414 So.2d 741 (La.1982). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1). Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. *State v. Brown*, 2003–0897 (La. 4/12/05), 907 So.2d 1.

 Rose claims that he did not have the intent to support his conviction. The jury, however, made a reasonable credibility finding in choosing to believe Becky, B.R., Lt. Flowers, and Agent Smith over Rose.[5] The jury had ample evidence to find Rose guilty of the responsive verdict of attempted second degree murder.

### Second Degree Kidnapping

La. R.S. 14:44.1, second degree kidnapping, states in pertinent part:

A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:

(1) Used as a shield or hostage;

(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;

(3) Physically injured or sexually abused;

(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or

(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.

B. For purposes of this Section, kidnapping is:

(1) The forcible seizing and carrying of any person from one place to another; or

(2) The enticing or persuading of any person to go from one place to another; or

(3) The imprisoning or forcible secreting of any person.

 Therefore, the state must prove the defendant (1) forcibly seized and carried the victim(s) from one place to another; and (2) that the victims were (a) injured or sexually abused; or (b) were kidnapped while the defendant was armed with a dangerous weapon or led the victim(s) to reasonably believe that he was armed with a dangerous weapon. *See*, *State v. Davies*, 35,783 (La.App. 2d Cir. 4/5/02), 813 So.2d 1262, *writ denied*, 2002–1564 (La. 5/9/03), 843 So.2d 389.

 Rose may have told Becky that she and B.R. were free to leave well after the criminal acts took place. This does not obviate the fact that Rose had a weapon, took the keys, forced Becky to move over to the passenger seat, and made Becky and B.R. unwillingly accompany him against their will.

The jury was entitled to give more weight to the commonality between Rose's actions on April 4, 2014, and his previous similar acts. The testimony of Myra and the victims was apparently more believable than that of Rose and Elmore. The state presented adequate evidence to sustain all three convictions.

---

5. *See e.g. State v. Collins*, 2010–1181 (La.App. 4th Cir. 3/23/11), 62 So.3d 268 (ruling that evidence was sufficient to find defendant guilty of second degree murder where, despite defendant's statement suggesting the gun accidently went off during a struggle, there was significant circumstantial evidence that directly contradicted defendant's statement).

## II. ILLEGALLY RESTRICTED IMPEACHMENT

 Rose argues that the trial court abused its discretion when it refused to admit the admission of Alisha Davis's testimony about the Facebook message Becky sent to her, in which Becky allegedly threatened to physically harm Rose. According to Rose, this ruling was in error because Rose intended to use the testimony to impeach Becky's credibility, specifically, her previous testimony that she never threatened to physically harm him. Rose argues that this entire case rests on Becky's credibility, and by not allowing admission of Davis's testimony about the 2012 Facebook message, the trial court committed reversible error.

The state responds that the trial court correctly denied the admission of the 2012 Facebook message, based upon the time that passed between the posting and the violence. The state also argues that the Facebook message, unlike the threatening texts from Rose to Becky, was not directly sent to Rose; rather, Becky allegedly sent it to Alisha Davis, who, at the time, was Rose's paramour.

Even if the trial court did err by not allowing the 2012 Facebook message, we agree with the state that the error was harmless. The evidence certainly showed that Becky was far from perfect. The addition of the 2012 Facebook message would clearly not have tipped the scales enough to make a difference in the verdict.

 Our law on this type of impeachment testimony is well settled.[6]

⌐₁₃Becky's testimony was corroborated by her daughter and multiple law enforcement officials. It is highly unlikely that the inclusion of the Facebook message would have changed the jury's verdict.

## III. EXCESSIVENESS

 Rose urges that his sentences are excessive. As previously noted, since the trial court did not rule on the motions to reconsider sentences, consideration of the excessiveness claim is premature because the sentence could be vacated by the trial court. *See, State v. Thomas*, 43,783 (La. App. 2d Cir. 1/14/09), 2 So.3d 1181, *writ denied*, 2010–0130 (La. 12/17/10), 51 So.3d 22.

 We further note under our error patent review, that Rose's sentences for two counts of second degree kidnapping are illegally lenient. Second degree kidnap-

---

6. La. C.E. art. 607, attacking and supporting credibility generally, states in pertinent part:

Extrinsic evidence, other than that offered to show a witness' bias, is admissible "when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." La. C.E. art. 607(D)(2).

The admissibility of extrinsic evidence to impeach credibility of a witness is subject to the relevancy balancing test, which requires the court to determine whether the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. *State v. Holder*, 50,171 (La.App. 2d Cir. 12/9/15), 181 So.3d 918. A trial court is given wide discretion when deciding whether to admit impeachment evidence. This is particularly true when the impeachment evidence is repetitive or cumulative. The trial court's decision is subject to review for abuse of discretion. *See e.g., State v. Dickerson*, 531 So.2d 1085 (La.App. 4th Cir.1988), *writ denied*, 537 So.2d 1160 (La.1989).

Even if the trial court abused its discretion in refusing to admit certain impeachment evidence, the error is subject to harmless error review. The appellate harmless error inquiry is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *State v. Mansfield*, 50,426 (La.App. 2d Cir. 2/24/16), 190 So.3d 322, 326 (internal citations omitted).

ping carries a hard labor sentence of five to 40 years, "at least two years of [which] shall be without the benefit of parole, probation or suspension of sentence." The trial court neglected to direct that any portion of the sentences be served without benefits. This error is not automatically corrected by operation of La. R.S. 15:301.1. The "at least" language of La. R.S. 14:44.1 requires the use of a sentencing court's discretion, requiring a remand. *State v. Hopson*, 39,570 (La.App. 2d Cir. 4/6/05), 900 So.2d 237; *State v. Dominick*, 2013–0121 (La.App. 4th Cir. 11/20/13), 129 So.3d 782, 787.

Because of this issue and the failure to rule on the motion to reconsider, we vacate all sentences and remand each charge for reconsideration of sentences.

### DECREE

All convictions are affirmed. The sentences are vacated and remanded to the trial court for resentencing, particularly directing the trial court to decide how many years of each kidnapping sentence shall be served without benefits.

CONVICTIONS AFFIRMED. SENTENCES VACATED; REMANDED WITH INSTRUCTIONS.