DREW, J.
*610 A jury convicted Cameron Kinte Mays, as charged, for three crimes;
• Aggravated rape, La. R.S. 14:42 ;[1]
• Aggravated kidnapping, La. R.S. 14:44 ; and
• Possession of a firearm by a convicted felon, La. R.S. 14:95.1.
For the aggravated rape and aggravated kidnapping convictions, he was sentenced on each to life at hard labor, without benefits.
On the firearm conviction, he was sentenced to 20 years at hard labor, without benefits. The three sentences were ordered to be served concurrently.
He appeals. We affirm the convictions and sentences. We remand for compliance with sex offender notification requirements.
FACTS
In 2012, S.K. and her roommate, Emily, were students at Louisiana Tech University, living together in their Robert Street home in Ruston.
On June 3, 2012, the two girls visited a friend in Bastrop, then returned to Ruston in the early evening hours. After watching television, Emily left to go to her sister's home. S.K. fell asleep on the sofa in her den, in the back of the house,
At trial, S.K. testified:
• in the early morning hours, she was awakened by voices in her home;
• she assumed that Emily had returned with her boyfriend;
• she reached for her phone that had been on the coffee table, but it was gone;
• she got up and started toward her bedroom;
• as she walked past the kitchen, someone jumped from behind the cabinets and grabbed her, covering her mouth and putting a gun to her head;
• she could discern two distinct voices of the intruders;
• the man who grabbed her was her height or a little taller, black, and had a bandanna over his face from the nose down;
• while she did not get a clear view of the men, she saw in her peripheral vision that the second man was bigger than the man who grabbed her;
• the second man did not make physical contact with her;
• she was forced to the couch and tied with a cord;
• her head was covered with a blanket;
• when asked for a condom, she directed the man to her bedroom nightstand;
• he took off her shorts and underwear and had sex with her, with penetration;
• she did not fight because she was afraid her attacker would shoot her;
• after the rape, the rapist uncovered her face, showed her an ATM card and asked if it was hers, and she confirmed;
*611 • she was then placed in the passenger seat of her white Mustang;
• the rapist drove and she was the only other person in the car;
• her impression was that, upon leaving her house, the rapist turned left;
• she also later felt the vehicle cross a railroad track;
• he drove her to an abandoned house, where her attacker made her drive to an ATM while he sat in the backseat with the gun to her head;
• she withdrew the maximum allowed, about $500, and gave it to the attacker;
• she was instructed to drive back to her house on Robert Street;
• she was then put back into the passenger's seat, the blanket was again put over her head and her hands were tied behind her back;
• the rapist then drove to an unknown location and exited the car;
• he got back in the car and drove them back to Robert Street, where he again got out of the car;
• he opened the trunk and had no more contact with her;
• she sat in the car for a few minutes;
• when she realized he was gone, she untied herself and ran into the house;
• as her phone was gone, she locked herself in her bedroom;
• she sent a Facebook message to Emily, requesting her to come home; and
• she did not shower between the rape and her later hospital examination.
S.K.'s roommate, Emily, testified:
• when she received this message, she quickly returned to care for S.K.;
• her recollection of the early evening of June 3 matched that of S.K.;
• she left S.K. asleep on the couch and went to her sister's home;
• she received S.K.'s Facebook message at approximately 6:00 a.m.;
• she found their house to be in disarray, with many items missing;
• they drove to the home of her parents and called S.K.'s parents;
• S.K. was taken to the police department and then to the hospital for an exam.
Clint Williams , Deputy Chief of Police of Ruston, testified:
• at the time of these crimes, he was a sergeant in the criminal investigation division of the Ruston Police Department, and was the lead investigator;
• he took many photos at the scene and seized a key chain and other items;[2]
• there were no unknown fingerprints on any surfaces inside the house;
• a key from the seized key chain was later found to fit a padlock at Mays' trailer home, located at 2003 West Alabama in Ruston;
• another key on the seized key chain opened the doors at Mays' mobile home;
• he took fingerprints from the driver's side window of S.K.'s car and *612 matched them with known prints of the defendant;
• he extracted from Mays' cellphone an incriminating text message, which had been sent to Brandon Bonton at 3:54 a.m. on June 4, 2012;[3] and
• the shortest route to Alpine Villa Apartments from Robert Street was a left on Barnett Springs Road and across the railroad tracks, just as S.K. had indicated.
Stephanie Guillot testified that in her capacity as a SANE[4] nurse, she examined S.K. at the hospital; the findings from that exam were consistent with the victim's report of being raped.
Robert Demps testified that he saw Mays at Alpine in the early morning hours of June 4, 2012. Mays was looking for his cousin, Vanessa Mays, with whom Demps lived. Demps saw someone covered with a blanket in the passenger seat of a white Mustang, and heard Mays say: "I wonder if she's thinking about me."
Markeva Daye lived with Robert Demps and Vanessa Mays at Alpine Villa Apartments, where she saw Mays later in the day. She overheard a conversation between Mays and Vanessa, in which Mays said about the victim: "she was thinking about him."
Vanessa Mays testified:
• she received several phone calls from Mays in the early morning hours of June 4, 2012, but she did not answer;
• when she saw Mays at the complex that day, he was talking about S.K. as a girlfriend, wondering if she was thinking about him;
• the key chain with the pink skulls belonged to Mays, and the key on the chain opened the padlock on Mays' trailer;
• a man named Kevin, who had been mentioned in connection with the rape, was a friend of Mays'; and
• she heard Mays say that he had sex with S.K.
Dr. Jessica Esparza , the DNA Technical Leader for the Northwest Louisiana Crime Lab, was qualified as an expert in DNA testing. She testified that the chance of DNA found on the cigarette butt being from someone other than Mays was approximately 1 in 14.9 sextillion.
Richard Beighley , a criminalist with the crime lab, testified that he matched Mays' known fingerprints with prints on the condom wrapper.
Sherree McCain , deputy clerk with the Lincoln Parish Clerk's Office, identified a certified bill of information and minutes showing that Mays pled guilty to simple burglary on December 11, 2007.
Mike Soileau , a deputy for the Lincoln Parish Sheriff, testified that Mays' fingerprints were on the bill of information relative to that burglary.
The jury convicted Mays as charged. This appeal followed.
DISCUSSION
Insufficiency of Evidence
There is no dispute that S.K. was raped and kidnapped by one of the intruders. The defendant, through counsel, challenges the sufficiency of the evidence regarding:
*613 • his identity as the individual who actually raped and kidnapped S.K.
• his alleged possession of a firearm; and
• the fact that the victim never saw either intruder.
In his similar pro se argument, the defendant maintains:
• he merely drove S.K. home after "Kevin" raped and kidnapped her;
• this constitutes a reasonable hypothesis of his innocence;
• the trial court failed to consider that Kevin participated in the crime;
• Kevin could have been the rapist/kidnapper; and
• there is no proof that he ever had the gun in his possession.
Our law on appellate review of insufficiency claims is well settled.[5]
*614 At the time of these events, the crimes were clearly defined.[6]
The evidence in this horrific case is overwhelming. Each of the three convictions is amply supported by this record, including, inter alia :
• the victim's testimony;
• the defendant's fingerprints found on the condom wrapper;
• the DNA evidence;
• his admission to his cousin that he had sex with the victim; and
• his inculpatory words overheard by Ms. Daye.
While the record indicates that a second intruder was present, S.K. testified that only one man raped her, drove with her, and twice held a gun to her head.
There is no evidence to even remotely suggest that the second intruder, whether it was "Kevin" or someone else, was the man who raped and kidnapped S.K., or who was the only person who was armed. This evidence excludes every reasonable hypothesis of innocence.
ADDITIONAL PRO SE ASSIGNMENTS OF ERROR
Prosecutorial misconduct
Mays claims that the prosecution:
• "completely ignored" that there was another suspect in the house;
• refused to allow him to say the name of "Kevin," who the defendant claims was the second intruder and the actual rapist/kidnapper; and
• submitted false evidence.
*615 Mays cites his direct testimony when he is asked about "Kevin."[7]
At this point, the district attorney's objection of hearsay was sustained. Mays now argues, based on the sustaining of this objection, that he was not allowed to mention "Kevin's" participation in the crime. Mays' arguments are simply not borne out by this record.
It is clear that all parties, including the jury, heard references to the second intruder and all evidence that was not presented identifying Mays as the rapist, kidnapper, and gunman.
Introduction of the audiotape
Immediately prior to trial, the district attorney stated his intention to introduce into evidence a redacted audiotaped telephone conversation between Mays and his sister while Mays was incarcerated at Ouachita Correctional Center. This recording came to the attention of the district attorney shortly before trial. In the 10-minute conversation, Mays states, "I'm not talking about the murder. I'm talking about the kidnapping." There are other portions of the conversation in which Mays references other criminal activity, including drug activity.[8]
The district attorney indicated that the recording would be heavily redacted to eliminate references to any other criminal activity, but would be offered solely for the kidnapping remark. Ruling on the admissibility of the recording was delayed in order for defense counsel to review the recording. The following morning, the matter was again raised, at which time defense counsel informed the trial court that Mays "would like the full version" of the recording to be played. Defense counsel advised the trial court that he had cautioned Mays that the recording would contain inculpatory and prejudicial statements, but Mays insisted. Despite Mays' request, the court ordered references to murder and drugs be redacted. Mays objected and stated that he wanted the references to drugs left in the conversation that would be introduced and played for the jury. The court relented and ultimately agreed that only the reference to murder be redacted, which was against the advice of Mays' counsel. The state did not introduce the recording in its case-in-chief.
*616 Once Mays indicated that he was going to take the stand, his counsel offered the recording into evidence and the district attorney objected on the basis of hearsay. The state argued that because the recording was introduced by the defense, it was being offered for the truth of the matter asserted and was inadmissible hearsay. The trial court sustained the objection. Mays now argues that the recording should have been admitted and the entirety of the conversation played for the jury.
La. C.E. art. 801(D)(2) states:
D. Statements which are not hearsay. A statement is not hearsay if:
***
(2) Personal, adoptive, and authorized admissions. The statement is offered against a party and is:
(a) His own statement, in either his individual or a representative capacity;
(b) A statement of which he has manifested his adoption or belief in its truth; or
(c) A statement made by a person authorized by him to make a statement concerning the subject.
Generally, any out-of-court statement of the accused constitutes hearsay unless subject to an exception. Such statement is admissible as an exception to the hearsay rule when it is an admission against interest. The defendant may not, however, introduce his own self-serving exculpatory hearsay statements. State v. Palmer , 45,627 (La. App. 2 Cir. 1/26/11), 57 So.3d 1099, writ denied , 11-0412 (La. 9/2/11), 68 So.3d 526 ; State v. Taylor , 31,227 (La. App. 2 Cir. 10/28/98), 720 So.2d 447, citing State v. Freeman , 521 So.2d 783 (La. App. 2 Cir. 1988), writ denied , 538 So.2d 586 (La. 1989).
When the district attorney realized that the entirety of the recording would be allowed into evidence, with minor redactions, he elected not to offer it into evidence. Then, the defense attempted to offer the conversation in its entirety. Presumably, Mays believed that the conversation contained exculpatory information. Since he intended to offer his own statement in his defense, in no way could the statement be construed as evidence "offered against him" for purposes of La. C.E. art. 801(D)(2).
A statement is admissible as an exception to the hearsay rule when it is a statement against interest under La. C.E. art. 804(B)(3). The audio evidence certainly could be construed as inculpatory. Thus, the court was presented with the unusual circumstance of a defendant, contrary to advice from counsel, seeking to introduce evidence that would actually help the prosecution. Nevertheless, the hearsay exceptions in art. 804 are operative only when the declarant is unavailable. Ordinarily, a criminal defendant would be considered unavailable as he has a privilege not to testify at trial. However, the defendant was considered available as he elected to testify at trial. As such, the statement was plainly hearsay and, thus, inadmissible. State v. Palmer , supra.
ERRORS PATENT
There is a mandatory fine for convictions of La. R.S. 14:95.1(B).[9]
Although the trial court's failure to impose a mandatory fine results in an illegally lenient sentence, we are not required to remand for imposition of a mandatory fine. State v. Dock , 49,784 (La. App. 2 Cir. 6/3/15), 167 So.3d 1097 ; State v. Fuller , 48,663 (La. App. 2 Cir. 12/11/13), 130 So.3d 960. The state has not complained about *617 the error, and Mays is not prejudiced on this issue.
Aggravated rape is a sex offense under La. R.S. 15:541. Those convicted of a sex offense are required by La. R.S. 15:543 to be provided written notification of the registration and notification requirements, and that an entry be made in the court minutes confirming said written notification.
This was not done. Accordingly, we remand for the trial court to provide the defendant the required written notification as to the sex offender registration requirements and to file written proof of such notice in the record of the proceedings. State v. Wilson , 50,418 (La. App. 2d Cir. 4/6/16), 189 So.3d 513 ; State v. Scott , 42,997 (La. App. 2d Cir. 2/13/08), 975 So.2d 782.
DECREE
The convictions and sentences of Cameron Kinte Mays are affirmed. The case is remanded for compliance with sex offender notification requirements.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.

Long after these crimes occurred, but before trial, La. R.S. 14:42, aggravated rape, was amended by Acts 2015, Nos. 184 and 256, to change the name of the offense to first degree rape. Subsection E was added, which explains: E. For all purposes, "aggravated rape" and "first degree rape" mean the offense defined by the provisions of this Section and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape. Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "first degree rape". The instant crimes occurred in June, 2012.

Items seized: (1) key chain with pink skulls on it, found on the couch where S.K. was raped; (2) cigarette butt found in the back yard; (3) hair straightening iron with cord found in S.K.'s car; (4) latent fingerprints lifted from the driver's side window of S.K.'s car; (5) a University of Texas blanket; and (6) an opened and empty condom wrapper found on the floor beside the couch where S.K. was raped.

"It's done like a gangsta. Then took the bitch on a ride in her Mustang blindfolded. Brought her to Alpine, let Rob see the shit. Got the TV, huge. Let my dude get. I'd arrest to help him. Erase this. Not a game."

"SANE" is an acronym for Sexual Abuse Nurse Examiner.

The standard of review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bryant , 12-233 (La. 10/16/12), 101 So.3d 429 ; State v. Steward , 51,006 (La. App. 2 Cir. 1/11/17), 213 So.3d 1174. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson , 14-0945 (La. 6/30/15), 172 So.3d 616 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 09-0310 (La. 11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Kelly , 15-0484 (La. 6/29/16), 195 So.3d 449 ; State v. Taylor , 47,400 (La. App. 2 Cir. 7/18/12), 103 So.3d 405, writ denied , 12-1898 (La. 3/8/13), 109 So.3d 355.
A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Robinson , 02-1869 (La. 4/14/04), 874 So.2d 66 ; State v. Freeman , 50,282 (La. App. 2 Cir. 4/13/16), 194 So.3d 1. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Reed , 14-1980 (La. 9/7/16), 200 So.3d 291 ; State v. Steward , supra ; State v. Kidd , 45,638 (La. App. 2 Cir. 11/3/10), 55 So.3d 90. Such testimony alone is sufficient even where the state does not introduce medical, scientific or physical evidence. State v. Joyner , 50,740 (La. App. 2 Cir. 6/22/16), 197 So.3d 724, and citations therein; State v. Johnson , 96-0950 (La. App. 4 Cir. 8/20/97), 706 So.2d 468, writ denied , 98-0617 (La. 7/2/98), 724 So.2d 203. This is equally applicable to the testimony of sexual assault victims. State v. Steward , supra ; State v. Joyner , supra ; State v. Seaton , 47,741 (La. App. 2 Cir. 4/10/13), 112 So.3d 1011, writ denied , 13-1056 (La. 11/15/13), 125 So.3d 1102.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Rose , 50,861 La. App. 2 Cir. 9/28/16, 206 So.3d 1102. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the (circumstantial) evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Rose , supra ; State v. Jones , 00-980 (La. App. 5 Cir. 10/18/00), 772 So.2d 788, 791. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Rose , supra. When the direct evidence is viewed in accordance with Jackson, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id.

In pertinent part:
La. R.S. 14:42, Aggravated rape
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) ***
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
La. R.S. 14:44, Aggravated kidnapping
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) *** ; or
(3) The imprisoning or forcible secreting of any person.
La. R.S. 14:95.1, Possession of a firearm *** by a person convicted of certain felonies
A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or possession of a firearm while in the possession of or during the sale or distribution of a controlled dangerous substance, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541, or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.

The following exchange took place:
Q: Were you [at S.K.'s house] by yourself?
A: No, sir, I was not.
Q: How many other people were with you?
A: I had one other person I was with, friend named Kevin. Associate, really, named Kevin.
Q: What was your relationship with this person?
A: Me and Kevin used to smoke weed together. You know, hang out in the apartments, sell weed together. That's how I met him. I actually met him from the apartments while I was hanging over at Alpine so we were real good associates.
Q: Can you tell me what you were doing at Robert Street?
A: Well. To be honest, I went to go steal. Late one night, Kevin told me that "man, listen, we got a lick."

The latter portion of the CD includes Mays talking about "twin," a/k/a "Kevin," a/k/a "KO," and Mays' assertion that Kevin was actually a confidential informant and told the police about Mays' involvement with the attack on S.K. Mays tells his sister that Kevin was with him during the attack, but states that he had no intention of bringing Kevin's involvement out because the state would have to prove Mays' guilt, which he thought the state could not do. Mays continually says that Kevin was with him during the crimes, but not until the very end of the recording does he imply that the other person "did this." The conversation is inculpatory, as it includes references to a murder and his drug use and sales. He also says at the beginning of the conversation that he was facing 15 charges and was looking at the death penalty.

The felon-in-possession of a firearm statute requires a fine of from $1,000 to $5,000.